DowNEy, Judge,
reviewing the facts found to be established, delivered the opinion of the court:
This action is for the recovery of various amounts, aggregating $4,288.01, in addition to those paid on account of 176 items of freight transportation furnished to and paid for by the United States. One hundred and fifty-four of these movements were for the War Department of the effects of Army officers changing station, 10 were for the Marine Corps, 1 for the Navy, and the remaining 11 for other branches of the public service. All the payments were made by disbursing officers on vouchers certified to be correct and presented to them by the plaintiff. The vouchers, in addition to other data called for by the prescribed form which is in the findings, including weights and rate, stated the “gross amount” deducted therefrom, the amount deducted *137 on account of land grant and, in the final column, the remainder, after such deduction, as the “ amount claimed,” they were all paid in the full amount claimed and such payment was accepted without protest. This action seeks to recover the difference between the amounts thus claimed and paid and the amount the plaintiff would have received had payment been claimed and made at commercial rates without, any deductions on account of land grant, and the claim is for a sum as to each item of transportation in addition to that already claimed and paid as claimed for the same items and is not for any other or different or additional service nor for omitted items. The case therefore involves not only the question of the applicability of land-grant rates to this class of freight transportation, a question already decided adversely by this court, but it involves further questions as to the right, under the circumstances of the case, to now recover amounts not then claimed. The findings are quite full as to the facts, much fuller, we fear, than is justified, for, in an effort to give the plaintiff the benefit of all of its voluminous requests for findings which seemed to even approach propriety, we have likely incorporated matter beyond the proper scope of findings of fact. Some statements are accounted for by the fact that suits by other railroads mentioned are submitted with this one and one set of requests are made applicable to all.
The case seems to us to be clearly within the holding of this court in Baltimore & Ohio Railroad Co. v. United States, 52 C. Cls. 468. The opinion in that case is lengthy, citing quite liberally from the authorities, and we desire to do more than merely refer to it in the usual way as an authority in support of what is said here. We reaffirm what is said in that opinion on the question here involved, call attention to the authorities cited, and to avoid lengthy repetition we treat it not merely as an authority but as a part of this opinion to be supplemented as further consideration and the facts of this case may justify.
The question as to the applicability of land-grant rates-to this class of transportation may be regarded as settled adversely by the Chicago, Milwaukee & St. Paul Ry. Co. Case decided by this court February 8,1915. In the opinion *138 in the B. & O. Case we called attention to the face that the questions there discussed were not presented to or considered by the court in the Chicago, Milwaukee & St. Paul Case, but we did not call attention to the findings in that case on which judgment was rendered, as we perhaps should have done. They are the findings of fact upon which the judgment was rendered, and they show that the amount for which judgment was rendered was the amount of deductions made by the accounting officers of the Treasury from the amounts due for the transportation at ordinary commercial rates, a radically different case from that with which we have here to deal.
This statement prompts the suggestion that in dealing with questions such as we here have for consideration the distinction between disbursing officers and the accounting officers of the Treasury must always be in mind and, one step further, action by neither nor both of these classes of officers must be permitted to obscure the independent right of access to this court. Disbursing officers and accounting officers function along their own particular lines. They are related in that the accounts of the former must be submitted to the latter for settlement and in that a payment by a disbursing officer contrary to the holding of the comptroller as to the propriety of payments from the accountable funds which have been advanced to him will likely subject him to a disallowance by the auditor in the settlement of his accounts, but there is jurisdiction in the accounting officers not possessed by the disbursing officers and a difference in the method of presenting claims. For the purposes of the discussion in the B. & O. Case the distinction was not drawn or required as here.
During the period covered by the transportation involved in this case and for many years theretofore there were three methods finding authority in the law or in regulations or arising out of established governmental practice either of which might have been resorted to by the plaintiff and other railroads to secure compensation for services rendered, viz:
1. Presentment of claim to a disbursing officer for payment. This was the method pursued in this case. It has its chief advantage in that prompt payment is secured. *139 Claims presented to a disbursing officer for payment must be upon a prescribed form, properly certified as to correctness by the claimant, and will only be paid when stated in the amount the officer is authorized to pay, since they must be used by the officer as his acquittances in rendering to the auditor his accounts as to expenditures from funds advanced to and charged against him. A disbursing officer will only pay when he understands he is authorized to pay under the decisions of the Comptroller of the Treasury, for such decisions will be applied by the auditor in examining his accounts and payments made in contravention thereof will be disallowed.
2. Presentment to the proper auditor for direct settlement. By this method claims may be presented for any amount or at any rate deemed proper by the claimant, and the auditor may allow or disallow the whole claim, or allow in part and disallow in part. The claimant may appeal to the comptroller for a revision of the action of the auditor in disallowing all or any part of the claim. The decision of the comptroller is conclusive on the executive branch of the government.
3. Suit in the Court of Claims. The Court of Claims has and for many years has had jurisdiction to determine the rights of claimants in cases of the character here involved and to render judgment irrespective of any decision by the Comptroller of the Treasury.
It appears that seven-eighths of the transportation in question in this case was for the War Department and of officers’ effects within the change of station allowance and the discussion has been addressed entirely to this class of transportation. The other, in minor amounts, follows, although as to it we have not been furnished with, but left to our own resources, as to regulations. It may be said that all the cases center around and are presented because of the transportation of Army officers’ effects on change of station.
This class of property was first authoritatively determined not to be Government property within the meaning of the land-grant acts on February 8, 1915, when this court rendered judgment in the Chicago, Milwaukee & St. Paul case. That action was commenced November 9, 1914. Up to that *140 time no railroad company had ever brought an action in this court to recover commercial rates for such transportation, and this plaintiff never brought an action until the instant case was commenced January 28, 1916.
The United States, in moving troops always and of necessity moved their equipage and supplies. That was Government-owned property. When an officer was required under orders to make a permanent change of station it was recognized that there were certain effects necessary for his use in the discharge of his official duties which, because not furnished by the Government, he must furnish for himself and which would exceed in weight the amount which could be carried by him in the regular way as baggage, and the right was granted him to have a limited weight of such effects called “baggage” transported to his new station at Government expense. The Government assumed this obligation just as it obligated itself for the expense of his personal transportation. There were regulations to that effect in force before there were land-grant railroads such as we here deal with. When land-grant transportation commenced this class of property was transported at land-grant rates without distinction in that respect between it and Government-owned property, and it does not appear, either in this case or from an examination of records and decisions, that there was any controversy over the matter. Eather is the inference authorized that it was a mutual construction of the rights of the parties.
In the B. & O. case much stress was laid upon the contention that the comptroller had decided that the transportation of such property was subject to land-grant deduction and we therein said that we had not been referred to any decision of the comptroller and that an exhaustive search indicated that there had been no decision on a disputed question so holding. Of course, the different comptrollers had always entertained that view and applied that rule, as was well understood, but there had been no holding to that effect in an official decision wherein the specific point was contested, the fact cited going not to the question as to whether that was the view of the comptrollers and the rule applied by them, but to the point that the railroads were not, in an *141 official way at least, contesting but were acquiescing in that Anew. A decision of the Comptroller as late as 1904, 11 Comp. Dec. 174, was cited wherein the Illinois Central Railroad Co. appealed to the Comptroller from a decision of the auditor applying land-grant rates to the excess over the regulation allowance of an officer changing station, the comptroller holding that the excess was not subject to land-grant deduction, and wherein the railroad company made no question as to the regulation allowance, although the -question was there if it cared to present it, but confined its contention to the excess, in effect conceding the correctness of the rule as to the regulation allowance.
We have given plaintiff’s counsel the benefit of requested findings, of very doubtful propriety, as to conversations with the comptrollers beginning in 1891, at which time he testifies his attention was first called to the matter, and of the requested fact that from statements made to him and former decisions he came to understand that the accounting officers would apply land-grant rates to this class of transportation, and that he expressed a contrary view. Let us see what is to be inferred from and where we are led by the facts presented.
We should perhaps recall in this connection and for possible desired reference hereafter that by Army appropriation acts in 1874 and 1875 Congress had prohibited any payments from the appropriations made to land-grant roads, but authorized suit in the Court of Claims, which followed by two railroads and, on appeal, the question involved was decided by the Supreme Court, 93 U. S., 442. The bill of particulars filed in this court in one of the cases, there being no itemized bill in the other, contains a list of the property transported for which compensation was sought, and of some interest is the fact that amidst a mass of items of Government-owned property, presumptively, are items of “baggage” and “private baggage,” without distinction in the plaintiff’s asserted rights with reference thereto. Thereafter Congress, in the Army appropriation act of June 30, 1882, 22 Stat., 117, provided for the payment for “Army transportation,” due to land-grant roads under the decision of the Supreme Court, limiting the payment to 50 per cent *142 of tariff rates, to be accepted in full and providing “ that any such land-grant roads as shall file with the Secretary of the Treasury their written acceptance of this provision, shall hereafter be paid for like services as herein provided.”' The same provision was repeated in the deficiency act of August 5, 1882, 22 Stat., 257-262, and on May 2, 1883, First Comptroller Lawrence held that—
“This statute was evidently designed to make all laws to-conform to the decision of the Supreme Court and to make-payment for all services accordingly, any doubt which might arise upon the language of the statute is to be resolved in favor of making it conform to the decisions of the Supreme-Court.” * * *
The Army appropriation act of February 24,1891, 26 Stat., 776, repeated the above provision as to payment of amounts due and provided for payments out of the appropriation for “ Army transportation ” to land-aided roads at rates deemed just and reasonable by the Secretary, of War, not exceeding 60 per cent of commercial rates, limited in later acts to 50-per cent. Second Comptroller Mansur, October 26, 1893, referring to the decision of First Comptroller Lawrence, held that the provision in question “ was intended to cover all property transported on behalf of the Government.”
It is these decisions that counsel refers to as confirming him in the belief that if the comptrollers would hold that Government transportation not payable out of the Army appropriation was subject to land-grant deductions they “certainly would require land-grant deductions to be made from all transportation charges payable out of said Army appropriation acts, as were household goods and other personal property.” (Italics ours.) Much later, in 1904, when counsel “ sought to have the comptroller change the holding of his office ” as to the class of transportation to which the restrictions of the act of 1891 applied, the question before-thé comptroller, presented by a company represented by this counsel, was as to transportation not payable from the-Army appropriation. The recital is unfortunately lengthy,, but the situation presented and the conclusion forced goes, to the merits of counsel’s theory. If when he was having-conversations with the comptrollers in 1891 and subse *143 quently, with these holdings as the text, he contended that land-grant rates were not applicable to movements of Army officers’ effects changing stations, and by our findings we import verity to his statement in that respect, he was discussing purely a moot question, for it was not before either of the comptrollers in either of the cases referred to.
It may 'be concluded that the purpose in presenting these facts by counsel’s own testimony and requesting findings based thereon is to establish, first, the understanding that the comptrollers would hold this class of transportation subject to land-grant deduction; second, nonacquiescence by him in the correctness of the holding; and, third, the futility of seeking compensation at other than land-grant rates at the hands of disbursing or accounting officers.
The first proposition may be conceded. And, further, it may be taken as settled, irrespective of specific decision, that it was the view of all the comptrollers that this class of transportation was subject to land-grant deductions, that wherever they have referred to the question they have so stated, and that that view of the law by them was well understood by everybody having to do with such matters.
The second proposition, if to be regarded as a proper subject for discussion, leads us too far into the personal equation. The personal opinion of one standing in the relation of local attorney to railroad companies having their usual quota of executive and legal officers surely can not avail against an established line of conduct extending over a long period of years. The strength and value of that opinion is to be considered in the light of uninterrupted practice by the employer and the fact that although employed to look after the collection of compensation due from the Government and looked to to advise as to suits for disallowances and for balances due, it does not appear whether the client was ever informed of the personal opinion entertained or whether suit was ever advised. If so the client must have disregarded the opinion as well as the advice, for it continued through many years to claim only land-grant rates and did not avail itself, if not satisfied therewith, of its right to test the question in the courts. Under such circumstances the plaintiff’s course of conduct is the determin *144 ing factor and the personal opinion of counsel is not for consideration.
As to tlxe third proposition, what can it now avail plaintiff to assert the futility of demanding a different rate at the hands of disbursing or accounting officers? Many times, in the argument of cases of this character, have we heard it urged that the railroads, in presenting their claims to disbursing officers for payments were in effect forced to present them at land-grant rates, because the disbursing officers would not pay on any other basis, and so, in this case, we are told that the railroads “merely billed the Government for what they understood the accounting officers would voluntarily pay, reserving their right .to sue for the amount deducted on account of land grant.” More confusion of disbursing officers, accounting officers, and “deductions.”
So far as the claims in this case are concerned we are not dealing with the accounting officers nor with “ deductions ” in the sense in which that word is used in association with the acts of those officers and the distinction is important to be borne in mind. We talk of deductions or disallowances when claims are presented to auditors for settlement and when, in this class of cases, claims having been made at full commercial rates there is a “ deduction ” by the auditor of the amount of land grant and a “disallowance” of that much of the claim. All the deductions that were in these cases were made by, the claimant before the claim was presented and they were simply mathematical processes necessary to determine the “ amount claimed.” A commercial or full tariff rate must be used as the basis of determining, by computation and deduction, a land-grant rate and the data required to be shown on the voucher under “distance,” “miles of land grant.” “weight,” “rate,” “gross amount,” and “ amount to be deducted ” are simply the elements entering into the determination and for verification of the correctness of the “ amount claimed.” There was no reservation of any kind and no protest when payment was made, and it may be conceded that as payment was made of the foil amount claimed there was then no room for protest. Under these circumstances plaintiff is maintaining that it can, for a long period of years, acquiesce, by its every action, in *145 tlie views of Government officials as to the basis on which it is entitled to be paid for such services, state its accounts continuously on that basis, certify the correctness of the amounts claimed and claim no more, receive payments in full of the amounts claimed, close its books as to the separate transactions and after many years of such procedure, not by reason of any successful showing as to a misapprehension of the facts but because of some indefinite sort of an alleged mental reservation, procure an additional payment not theretofore claimed on account of the same service, and that too after some other company has contested and established a right under a different procedure.
We think the proposition answers itself. But aside from the situation as thus presented, and notwithstanding counsel’s assertions as to his own belief in the matter, we can but conclude from this long-continued uniform course of action by plaintiff that during all those years it had no intention of claiming anything more as to these transactions than that claimed in the certified vouchers and paid. All the facts justify this conclusion, for a course of conduct is more potent than assertions of belief unacted on. But if such a conclusion were otherwise subject to question it appears from the evidence that the plaintiff’s charge upon its books was only of the amount claimed in its vouchers, and that when that amount was paid “the transaction was behind us.” The quoted language is the language of plaintiff’s auditor.
Applying the conclusions in the B. and O. case, and the stated reasons therefor, and the authorities cited, this case might well rest here, but we are met with so much of contention on various propositions, not only in this, but in other cases of like character now under submission, we are prompted to attempt to cover the whole field.
The different methods of asserting claims against the Government have been outlined. We may assume that railroad companies, having so much to do with such matters, and having employees whose duty it is to look after them, not only should, but in fact do, understand them. It is argued to us, in attempts to escape the effect of past per- *146 formalice, that in stating vouchers for payment by disbursing quartermasters there was no option but to state them at land-grant rates, because such officers would pay them only when so stated, and, ergo, such method of statement was compulsory. The argument is without force. We have shown, we think, that they were in fact so stated because that was all that was claimed, and there was no intention to claim more, but if in fact the plaintiff believed more was due, and intended to claim more, it could easily do so by presenting its claim to the auditor, instead of the disbursing officer, and in so presenting it it could claim commercial rates or whatever it saw fit to claim.
As to this procedure it is argued that it would have been fruitless because the auditor would have made the settlement at land-grant rates, disallowing the excess, and it was understood to be useless to appeal to the comptroller. True enough; and so far as payment was concerned the result would have been the same. But plaintiff, thus securing for itself the same actual payment, would have been in the attitude of asserting, through the proper channels, its claim to compensation at a different rate; it need not have appealed to the comptroller if it regarded it as a vain thing, and the doors of this court were always open to it to test its right to recover what it had claimed and been refused and to establish by precedent its rights as to future transactions. It would then have been in the attitude of suing for something it had claimed and which had been refused it by the auditor, and not of claiming something more on account of closed transactions as to which its course for many years had conformed to established practice and as to which it had been paid all it claimed.
In this connection we call attention, without repetition, to what is said in the B. & O. case on the subject of estoppel, equitable or quasi, the splitting of causes of action, the mistake, if mistake there was, as a mistake of law and not of fact, the necessity, particularly in Government matters, that there shall be finality and an end to accounting and the authorities cited. In connection with the authorities cited in that case much is now made in the argument of the cases before us, of the fact that we failed to cite therein two cases *147 decided by this court, viz: Great Northern Railway Co. v. United States, 42 C. Cls., 234, and Finney v. United States, 82 C. Cls., 546. The first of these cases seems to us to have involved a mistake of fact as to the land-aided character of the 2.18 miles of road involved. In the second, carefully considered, we find nothing in conflict with the views expressed in the opinion in the B. & O. case or in this opinion. Bather, by reason of the facts does it tend to confirm them. But what if it be conceded that there are authorities tending to support different conclusions than those arrived at in that case, there are other authorities, we know, which might have been cited in support of the conclusions reached, there are doubtless many others which our limited resources did not develop and it is but in line with our common experience to find authorities apparently in support of both sides of a proposition. We accept, in such circumstances, the weight of authority applicable to the case in hand.
In the B. & O. case we discussed, as to the accounting officers, the effect of the presentment of a claim and acceptance of payment upon an attempt to thereafter assert a demand for further compensation growing out of the same transaction, except in case of fraud or mistake, and suggested the application of the principle when resort is had to this court. It did not occur then to suggest the application of the same principle in this court, not merely by analogy, but by the specific provisions of sections 178 and 179 of the code, repeating the provisions of sections 1092 and 1093, Eevised Statutes. Section 178, provides that payment of the amount due by any judgment of this court shall be a full discharge of all claims touching any of the matters involved in the controversy, and section 179 provides that any judgment against a claimant shall bar any further claim arising out of the matters involved in the controversy. The plaintiff could not, as to any transaction involved herein, present a claim to an auditor at commercial rates and, on allowance of the claim less land-grant deductions, accept the amount allowed and have his appeal to the comptroller as to the balance. This is not mere accounting practice, it is the law (the Dockery Act, section 8, 28 Stat. 208). It should be self-evident that it can not nullify the law by claiming and *148 receiving from a disbursing officer what it understood the officer would voluntarily pay and have adjudication by the accounting officers as to a further sum. Likewise it is apparent, not only on principle but by express provision of statute that it could not, in this court, sue for compensation on a land-grant basis, recover its judgment and accept payment and, afterwards, perchance after another decision in another case, sue for additional compensation as to the same transaction. The whole Government scheme as to determination and payment of such claims is involved in these three authorities, disbursing officers, accounting officers, and courts, and it would seem entirely subversive of fundamental principles to hold that a course of conduct which would be conclusive as to a part of the system finds some sort of a hiatus therein beyond which it is relieved from the effects of its course of conduct and reinvested with abandoned rights. Of course this proposition has no bearing upon the question of a right of action in this court for a disallowed part of a claim properly made.
Preliminary to the discussion of one or two remaining questions it is proper to give attention to the effect, if any, of Finding Y, setting out, in compliance with a request of plaintiff, the usual Government form of bill of lading, used in these cases, and for that matter, in all shipments on Government account. Significance is attempted to be given to the use of this form and its descriptive words “public property ” as importing a representation as to the ownership of the property, deceiving the carrier and leading to the application of an erroneous rate. In the light of the evidence and the statements of some of the witnesses, voluntarily placing themselves in the attitude of seriously reflecting on their own intelligence, it is difficult to regard the contention seriously.
Theoretically, if the theory is to be of any avail, the railroad companies, this plaintiff, for all these years, even if we do not go back of 1891 when the attention of counsel, herein was first called to the matter, believed this class of property was Government-owned property and, not having informed us specifically as to just when they learned to the contrary, we 'must assume that it was not until this court *149 decided the Chicago, Milwaukee & St. Paul case, even though no such question was in that case.
Counsel can scarcely contend that he did not know the facts as to this property in the light of his testimony and the finding based thereon that in conversations with comptrollers at that remote time he contended that land-grant rates were only applicable when “ the freight was property of the United States and the personal property of Army officers was not such property,” and in the light of his knowledge of the whole situation through succeeding years, including the decision of the comptroller in 1904, referred to by him, in which the comptroller was asked to and did apply a different rate to the excess over the regulation allowance all involved in the same shipment and ownership. And if counsel knew the situation all these twenty or twenty-five years, as he undoubtedly did, it would be an unjustified reflection on him to assume that he permitted the companies he represented to proceed to their disadvantage under such a mistake of fact. But further discussion is unjustified. There is no room for doubt that the railroad companies generally, plaintiff included, knew full well the character of this property. What some subordinate clerk doing merely clerical work knew or didn’t know is highly immaterial. And the iise of a Government form of bill of lading can certainly avail the plaintiff nothing unless it was deceived thereby as to its rights. Such a contention is wholly untenable.
The case is, in our opinion, clearly foreclosed by what has been said, indeed by much less than has been said, but although not necessary to its determination, we want to suggest two further questions.
In Finding V, following the form of bill of lading, it is said that “No express contracts otherwise were made for the transportation here involved.” We were requested to find that “no contracts other than the Government bill of lading were made.”
The bills of lading made no contracts as to the specific compensation to be paid. Under them proper tariff rates were the basis, and the law required the deduction therefrom of land-grant if the shipments were within the land-grant acts. It does not appear that anything but land- *150 grant rates was ever applied in the settlements for transportation of this kind until subsequent to all the transportation involved in this case. It is conceded to have been the established practice to pay all railroads, the plaintiff included, at land-grant rates, their bills were rendered at land-grant rates, and payment was accepted without protest. When a shipment of such property was tendered, or, limited to this case, when the carrier accepted them knowing that it would be paid at land-grant rates, made no claim for any more and, because of that fact and because, when paid, it considered the transaction closed, it is to be assumed that it never expected to be paid any more. It knew this was the basis on which the Government expected it to furnish the transportation; it had acquiesced therein continuously, and these particular transactions followed a long-established practice. To us it seems that the facts raised an implied contract to furnish the transportation at land-grant rates.
A different view of contract relations would result as follows: The position of the Government, through its accounting officers, well known to the carriers, was that the class of property here involved was quasi public property and entitled to transportation at the same rate as Government-owned property. If, with knowledge of its true character and of this construction, it was accepted on a Government bill of lading as “ public property,” then, if the fact that a Government form of bill of lading was used is material, does it not follow that there was a resultant contract obligation on the part of the carrier to transport it as public property and at the rate applicable thereto ?
After the decision by the Supreme Court of the Land Grant cases Congress appropriated to pay the railroads what might be found due for services rendered, limiting payments to 50 per cent of tariff rates, which “shall be accepted in full for all demands for said services ” and providing :
“That any such land-grant roads as shall file with the Secretary of the Treasury their written acceptance of this provision shall hereafter be paid for like services as herein provided.”
*151 Whether any such acceptances were ever filed is not shown and is, we think, immaterial.
Appropriation acts for each fiscal year thereafter appropriated for “ Army transportation ” one limiting payments to land-grant roads to 60 per cent of tariff rates, but all others limiting it to 50 per cent, and all providing that such payments should “ be accepted as in full for all demands for such service.” The appropriation act for the fiscal year 1910, the first year within which service sued for herein was rendered (35 Stat., 732-745) appropriated under the subhead, “ Transportation of the Army and its supplies,” and provided “ that in expending the money appropriated by this act ” land-grant roads shall be paid for the transportation of “troops and munitions of war and military supplies and property ” only on the basis of such rate as the Secretary of War shall deem just and reasonable, “ not to exceed 50 per centum of the compensation for such Government transportation as shall at that time be charged to and paid by private parties to any such company for like and similar transportation, and the amount so 'fixed to be paid shall be accepted as in full for all demands for such service? (Italics ours.) The same provision is found in the appropriation acts for all years covered by the claim herein. The maximum within the limitation has always been paid.
We need not discuss established rules with reference to the use of appropriated funds. They are available only for the purposes for which appropriated and a given service can be paid for only from the available appropriation.
This appropriation was available for the transportation of officers’ effects on change of station, was always construed as available therefor by officers authorized to determine such questions, was the only appropriation available for such purpose and every payment made to plaintiff on account of such transportation involved in this suit was made from that appropriation. It may safely be assumed that this plaintiff and all other railroads knew that this was the appropriation from which they were paid for such transportation, but that is in fact immaterial under the rule of presumption as to knowledge of the law.
*152 And it can not affect the question to contend that this transpoi’tation is not within the classes of transportation referred to in the limiting clause or is not within the land-grant acts. The provision is, first, a limitation on the use of appropriated funds, and second, a condition attached to acceptance of payment therefrom. It in effect says to any land-grant road, when you accept a payment from this appropriation you must do so upon the express condition that it is in full for the services rendered. How then may -it have the benefit of money, as to the expenditure of which Congress is authorized to impose conditions, and repudiate the condition?
For the reasons stated in the opinion in Baltimore and Ohio R. R. Co. v. United States, supra, and in this opinion we conclude that the plaintiff can not recover. Its petition will therefore be dismissed with judgment against the plaintiff for cost of printing the record to be taxed by the clerk.
Hay, Judge, Booth, Judge, and Campbell, Chief Justice, concur.
Barney, Judge, did not participate.