DowNey, Judge,
delivered the opinion of the court:
Plaintiff seeks to recover on account of a large number of items of personal transportation furnished between March 1, 1912, and June 18, 1916, in exchange for the usual Government transportation requests, the basis of the claim being the difference between the amounts claimed in its bills and paid as claimed, at land-grant' rates, and the full tariff rates for such transportation; in other words, it is a suit to recover, on account of this transportation, the amounts deducted from full tariff rates on account of land grant, such deduction having been made by the plaintiff itself in the rendition of its bills.
The claim as originally presented, covering the period from March 1,1912, to December 31,1917, inclusive, has been reduced by the abandonment of that portion subsequent to June 18, 1916, because of the taking effect on that date of what is known as the interterritorial military arrangement, and by the abandonment of claims on account of the transportation of persons other than those belonging to the following classes: Applicants for enlistment, both accepted, but traveling before final acceptance, and rejected; discharged military prisoners; discharged soldiers; retired soldiers; furloughed soldiers; and civilian employees of the War Department.
It may now be said that the status of the classes named, civilian employees excepted, is no longer in- question for the purposes of this case, since it was held by this court in the case of the Union Pacifio R. R. Co., 52 C. Cls. 226, that they were not within the designation “ troops ” and therefore not within the provisions of the land grant acts as to transportation of troops and property of the United States, a. decision which upon appeal was affirmed by the Supreme Court, 249 U. S. 354, but because of other features of the case determinative of plaintiff’s rights and necessarily for consideration, the situation previous to the decision referred to must be looked to. And since it is apparent that questions involved in this case growing out of procedure with reference to these claims are important for determination not only •as affecting the rights of this plaintiff in this particular case *44 but because we must know that they, under like or similar circumstances, are involved in other pending or to be anticipated litigation, we shall feel justified in treating the situation somewhat in detail.
But preliminarily it is perhaps well to dispose of the status of “ civilian employees of the War Department ” included to a limited extent in this action, but not included in tlxe decision above referred to, by concluding, without discussion, that such travelers were not “ troops ” of the United States within the purview of the land grant acts, this expression, however, involving no opinion as to the possible status, under some circumstances, of civilian employees of the Army.
It may be said generally that previous to the decision of this court in the Union Pacifio case and for some time previous to the period involved herein, the status of the classes of persons considered therein was, for transportation purposes, that of troops of the United States by reason of holdings by the Comptroller of the Treasury that for their transportation railroad companies could be paid at land-grant rates only. And such matters being unquestionably within the jurisdiction of the comptroller, whose decisions as to the expenditure of appropriated moneys were conclusive, such holdings established the status of these various classes of travelers for transportation pay purposes at least so long as resort was not had to a ¡n'oper judicial tribunal in an attempt to enforce a right to other and different compensation and no attempt along this line was made by this plaintiff at any time or by any other railroad company until the institution of the Union Pacific case, supra, which was commenced in this court on April 29, 1915.
The case naturally divides itself for consideration into three periods, viz, March 1, 1912, to December 31, 1913, inclusive; January 1, 1914, to September 30, 1914, inclusive; and October 1,1914, to June 18, 1916, inclusive, and separate findings are addressed to these periods.
To avoid repetition of facts common to each of these pex’iocls, it may here be said that all of plaintiff’s bills for transportation here involved were stated upon the regular approved form of voucher for such transportation of passengers as was subject to land-grant deduction, and by *45 “ approved ” form is meant a form prescribed by the Comptroller of tbe Treasury with the approval of the Secretary of the Treasury under authority of the Dockery Act. See 28 Stat. 206, sec. 5. This form required the stating of the claims in separate columns under the following headings: “Date,” “No. of transportation request,” “From,” “To,” “ Total distance,” “ Miles of land-grant road,” “ No. of men,” “ Eate per man,” “ Gross amount,” “Amount to be deducted on account of land grant,” and “Amount claimed.” A certificate followed stating among other things that “ the above account is correct and just,” to be signed by the transportation company by some proper representative, and upon the form was the following instruction: “ Certification and bill to be completely filled in by payee or 'before signature by payee, without alteration or erasure thereafter.” See 14 Comp. Dec. 977.
The use of this and other forms relating to Government transportation was specifically prescribed by Department Circular No. 62, dated October 29,1907, issued by the Comptroller of the Treasury with the approval of the Secretary. 14 Comp. Dec. 967.
This form was slightly changed, principally in its “ makeup,” on two occasions subsequent to the promulgation of the form set out in 14 Comp., but the essential requirements above stated were .all retained and appeared in all land-grant voucher forms prescribed for use from 14 Comp, to and throughout the period here involved.
At the same time that this voucher form for transportation of passengers subject to land-grant deduction was prescribed appropriate forms were also prescribed for voucher-ing transportation not subject to land grant. From them the columns headed “ Miles of land-grant road,” “ Gross amount,” and “Amount to be deducted on account of land grant” were omitted. (See circular above referred to and Form No. 8 on page 980, same volume.) These and other prescribed voucher forms were available to the railroad companies in such quantities as they might desire, and it was therefore the option of a railroad company, in the first instance, to state its claim on such form as it might deem appropriate thereto.
*46 For the first of these periods beginning March 1, 1912, all bills involving land grant to the amount of $39,253.54 were thus presented and paid as presented and there was no other action with reference thereto except that upon one bill for transportation in September,. 1913, involving land grant to the amount of $294.06, there was stamped what is now called the short form of protest, viz, “Amounts claimed in this bill accepted under protest.” Throughout this period, therefore, with the single exception stated, the effect of which, if any, we will hereafter consider, there was manifest no intention otherwise than to acquiesce in the then prevailing rule as to the status of these travelers and to claim for their transportation land-grant rates only, and we may reasonably presume that this had been the attitude of plaintiff for some time preceding this period, for the rulings as to the status of these persons had considerably antedated it except as to discharged soldiers, who were not furnished Government transportation until after the passage of the act of August 24, 1912, 37 Stat. 576, but had theretofore received travel pay, and there is no indication that the fixing of March 1, 1912, as the beginning of this period indicated any change of policy or anything other than that it was the utmost limit to which the period of six years before the commencement of this suit on March 1, 1918, would reach. As to this period, it is sufficient to say that recovery is precluded under the authority of Baltimore & Ohio R. R. Co. v. United States, 52 C. Cls. 468, and Oregon-Washington R. R. v. Nam. Co. v. United States, 54 C. Cls. 131; affirmed 255 U. S. 339.
With the second period here involved, commencing January 1,1914, began a practice of typing, or for the most part stamping on the vouchers, rendered and certified as heretofore stated, a form of “ protest,” although all vouchers were not so “ protested.” And it is the alleged practice of the plaintiff with reference to the protesting of vouchers which divides the case into the three periods, a different practice prevailing in each period to such an extent as to justify the separation, although there was not complete uniformity. The first period is therefore treated as a period of no protest, which is true as to all of that period with the single ex *47 ception noted; tbe second period is tlie period during which, the prevailing practice was to stamp on the vouchers the “ short-form ” protest; and the third period is one during which, upon most vouchers, the “ long form ” of protest was used. The use of the word “ protest ” is for convenience and in line with plaintiff’s presentment of its case without intention thereby to commit ourselves as to the legal effect of the words used under the circumstances.
During the second period, from January 1, 1914, to October 1, 1914, there were 508 bills involving a total land grant of $71,560.92, of which 201 involving $24,176.62 of land grant bore the short form of protest, 4 involving $843.96 of land grant bore the long form of protest, and 303 involving $46,540.34 of land grant bore no protest. Thus of 508 bills involving $71,560.92 of land grant, 201 thereof involving $24,176.62 of land grant had stamped on them before presentment the words, “Amounts claimed in this bill accepted under protest,” and, eliminating from the discussion for the present the few cases in which another form was used and which must be the subject of discussion as to the third period, we must consider the legal effect of this procedure. It is contended that when plaintiff began in January, 1914, the practice “ of noting on its bills its formal protest against a settlement at land-grant fares” and continued the practice with some degree of regularity, although it appears that it “protested” less than half its bills, it put the accounting officers on notice that it was claiming full tariff fares for all such transportation and was rendering its bills and accepting payment at land-grant fares under protest and as part payment only. If its practice determines its policy it is for consideration that in a majority of cases its bills bore no protest.
The striking feature of this situation is that the plaintiff puts itself in the position of rendering a bill for a stated amount, found under the heading “Amount claimed,” arrived at by the application of correct mathematics to previously stated amounts, certifying that the amount is correct and just, and then stamping on the voucher before presentment a statement that the “ amount claimed,” necessarily *48 by it, and shown by its certification to be correct, is accepted under protest.
We are conversant with the argument that disbursing officers, under rulings of the comptroller, could pay no more, and that it was useless to present to them a claim for more, but we have fully pointed out in the Baltimore & Ohio and Oregon-Washington cases, supra, the methods of procedure open to claimants if they desired in fact to present their claims upon a different basis. And it may be said that railroad companies and their officers and attorneys were very familiar with all these methods. Such a conclusion must follow from the extent and frequency of their claims, necessitating resort to established settlement methods, and, indeed, familiarity with the accounting system appears from the testimony of plaintiff’s attorney in this case. Any other conclusion would no doubt be regarded as a reflection on his long experience and competent service in the interest of railroad claimants. But, notwithstanding the availability of this other and better procedure, if a claimant desired in fact to assert a right to something more than it could obtain at the hands of a disbursing officer, we need not now determine whether it could not preserve a right by a proper protest, since that question will naturally be for later consideration in its application to any form of protest. As to the procedure now under consideration, we do hold that such a so-called protest was not in fact an effective protest, if there could be one, and under the circumstances could avail the plaintiff nothing.
We frequently encounter the apparent belief that a “ protest” is “something to conjure with” under almost any circumstances; that it wipes out the disastrous results of any course of conduct; and that it creates as well as preserves rights. Equally is it sometimes the view that whatever its form or applicability it is only necessary to label it a “ protest ” and it is a protest. And these observations are not at all antagonistic to the idea that there may in fact be protests, rightly so called, and that they may at times be very efficacious in the accomplishment of their intended purpose, but suggest rather the necessity of determining whether a so-called “protest” is in fact and in legal effect a protest, *49 and whether, tinder the circumstances, it accomplishes anything as affecting the rights of the protestor. In one of our early cases, Hildeburn v. United States, 13 C. Cls., 62, 70, a protest was characterized as “ so much waste paper,” and in numerous cases they have been held ineffective for any purpose.
We find no established rule with reference to any particular form of protest in general, and this quite naturally so since the circumstances of each case must largely determine the applicable form, although in some cases in which protests are provided for by statute particularity is required as, for example, in the matter of protests as to customs duties when the requirement is that it shall set forth “ distinctly and specifically and in respect to each entry or payment the reasons for his objections thereto,” while in other cases wherein the action taken is of such specific character that there is but one possible subject matter for protest the requirement only is that there shall be protest, which by necessary implication addresses itself to but the one matter, and that the action of a party other than the protestor.
To us it seems but reasonable to hold that if the transaction itself does not so define the situation that a protest in general terms can have but one application, and that an application entirely consistent with the relations of both parties "to the transaction, then a protest must so specifically state its subject matter and the respect in which action had is objected to that its purpose may clearly appear on its face.
We know now, in our consideration of this case, that plaintiff’s contention is that the transportation in question was not subject to land-grant deduction, but the short form of protest used presented no question of land grant to the disbursing officer any more than it presented any one of the several other questions which might be involved in data stated in the voucher. So far as appears it might have been a question as to the number of men, the mileage traveled, the correct land-grant mileage, or the gross rate as well as the applicability of land-grant rates.
It is true that we were requested to find as a fact that the plaintiff’s procedure after January 1, 1914, put the account *50 ing officers on notice that plaintiff was claiming full tariff, fares and was rendering its bills and accepting payment at land-grant rates “ under protest and as part payment only ” and, upon submission of tentative findings, we were again requested to find that:
“ It appears from the evidence that the short form of protest was understood by the accounting officers of the Government to mean that the plaintiff protested against the requirement of land-grant deductions on the classes of transportation covered by the bills to which said protest was attached.”
And it is true that a passenger rate clerk on the transportation rate board in the General Accounting Office testified that it was a part of his official duties to audit such bills and that it was his understanding that in using such form of protest the plaintiff company was protesting against making any land-grant deduction; but aside from the competency of this testimony for this purpose, which we more than question, the transactions as to the presentment and payment of these bills relate back to the time of their presentment to and payment by the disbursing officer, and we are unable' to see how that situation can be affected by the understanding of anyone in the accounting office when the disbursing officer’s accounts were thereafter being audited. The clerks in the accounting office were then determining the credits to which» the disbursing officer was entitled, in the settlement of his accounts, by reason of the payments made on these vouchers and with that determination their duties with reference thereto ended. They were not then considering any claim of the plaintiff submitted for allowance or otherwise and had no question before them as to the purpose or effect of the protest, and authority to speak as to the “ understanding ” of the accounting officers does not appear.
It should now be suggested that during consideration of this case on first submission certain information then came to our attention with reference to possible practices in the offices of disbursing officers by way of departure from authorized procedure, indicating the possibility that injustice to the plaintiff might result if the case were considered solely in the light of authorized rather than actual .procedure on *51 the part of disbursing officers, and the case was remanded with leave to take further testimony if desired.
Upon resubmission the record contains the testimony of a witness who was a clerk and for a part of the time head clerk in the office of the disbursing officer by whom these bills were paid, this clerk having in usual course handled the bills, or at least a part of them, so that he had knowledge of the use thereon of this short-form protest.
Based upon his testimony and that already in the record above referred to we are now asked to modify the tentative findings by adding a finding to the effect that it was understood by the disbursing officer and by the accounting officers that in using this shoirt-form protest the plaintiff was protesting against the settlement of its bills at land-grant rates and was preserving a right to make further claim for full commercial rates before the accounting officers and the courts.
We are very willing to give the plaintiff any finding to which it may be entitled and prefer to err through liberality rather than otherwise, but we do not find that this witness qualified himself to testify as to the understanding of the disbursing officer, and we have, we think, gone as far, if not further, than justified when we incorporate in the findings of fact a statement as to the understanding of this witness himself as to the meaning and purpose of this protest. And in connection with the testimony of this witness we may suggest that if all his statements as to practice in the disbursing office were converted into findings of fact, it would be of very doubtful value to plaintiff, for it must carry with the things relied upon as of value other matters clearly not so to be regarded by the plaintiff, notably the refusal to settle disputed claims and the settlement only of those matters as to which the claimant and the disbursing officer were in agreement. Comment upon this testimony, not incorporated in the findings, is only justified for the purpose of indicating its careful consideration in all its phases.
Aside from the probative value of the testimony as to the understanding of the disbursing officer, it is to be suggested in this connection, perhaps to be again referred to, that whatever the understanding of the disbursing officer may *52 have been as to the purpose or effect of this protest, he was an officer of very limited, powers, and his understanding or even his approval could not have served to create any liability against the United States not otherwise existent.
Other testimony upon resubmission apparently intended to indicate the continuing intention of the plaintiff to contest the application of land-grant rates to the classes of transportation involved, is largely a recital of communications between railroad officials on the subject, not a proper basis for a finding of fact, and probably with full comprehension of that fact no request for a finding based thereon is. submitted.
In addition to suggestions made as to the indefinite character of this protest, we are asked to conclude that a public voucher made in the detail form indicated and certified to be correct, not only as to its details but as to the “ amount claimed,” and which is required to be completely filled in before certification, without alteration or erasure, all to the evident purpose that there shall be stated a clean-cut demand which may be paid by a disbursing officer at the “ amount claimed ” and that only, for which it becomes his acquittance, can be converted into a claim for a partial payment with reserved right to make further claim as to the same service by stamping thereon the statement that the “ amount claimed,” which has been stated and certified by the claimant, is “ accepted under protest.”
We can not subscribe to such a theory. Its inconsistency, as well as its apparent purpose to take advantage of a method of settlement designed to accomplish finality while at the same time subverting that purpose, condemns it. And in that connection the necessities of Government accounting are properly for consideration and perhaps ought to be reverted to more than they are. With these necessities and the disadvantages of lack of finality in Government accounting, those doing business with the Government not only are, for the most part, familiar, but should be chargeable with knowledge and, unless required for the protection of a legal right not otherwise to be asserted, practices which impose unnecessary burdens on the governmental system should not be encouraged by judicial sanction'. And for consideration *53 also is the fact that appropriations are for the service of fiscal years — that they are available for such time thereafter as Congress has thought reasonable to permit the adjustment of claims payable therefrom, a situation indicative of intention to accomplish reasonably prompt presentment and settlement of claims.
And if by such a procedure as that under consideration the finality of a settlement such as those here involved may be suspended and an account thus settled be held to be still open for further claims, predicated on the same service, to be asserted at any time within the six-year period of limitation, is there any reason why such a protest stamped upon any voucher in settlement of any claim of any character might not obviate its finality and serve to hold the whole matter open and subject to further claim at least until the intervention of the statute of limitation? If there is one thing apparent, predicated upon our observation in these matters, it is the great need for a revised system which shall require the prompt presentation of claims, not only to- the administrative and accounting offices but to this court as well, and while we can not assume legislative function, and we certainly can not but recognize and protect any right legal under the present system, we are not disposed by judicial construction to extend beyond legal requirements the effect of unnecessary and detrimental practices.
We think it quite clear that the use during this period of this form of protest could avail the plaintiff nothing. Aside from the infirmity in the form of the protest, which sufficiently determines its value, what must be said in the discussion of the following period as to the efficacy of any protest will be applicable.
As to the third period, the contention is that at the beginning thereof, on October 1, 1914, a different practice was inaugurated in that on the vouchers, all stated on the approved form as hereinbefore outlined, there was typed, before presentment, the long form of protest, as follows:
“As U. S. Government accounting officers claim they have no authority to allow or pay for the transportation of discharged soldiers more than the fares for troops of the U. S., such fares are shown herein but under protest, and S. P. Co., *54 for itself and connecting carriers, does not waive any of its rights to full published tariff fares, and any payment at any less amount will be accepted as part payment only for the services performed.”
During this period extending to the taking effect of the interterritorial military arrangement on June 18,1916, there were presented 728 vouchers involving land grant to the amount of $75,467.74, 516 of which, involving land grant to the amount of $50,678.94, bore this long form of protest; and 212, involving $24,788.80 of land grant, bore no protest, so that the practice was not uniform but sufficiently so as to justify the treatment of the period on the basis of the long-form protest.
It is for observation first that this form of protest is not subject to the objection of indefiniteness suggested as to the short form. It pointed out the specific subject matter of the protest and the reason therefor.
But while it is specific, the very respect in which it is specific precludes the construction sought to be put upon it. It is urged as preserving a right in the plaintiff to seek additional compensation as to all persons within any of the classes under discussion, whereas by its express terms it is addressed only to “ discharged soldiers.” And it is to be interpreted not alone upon the inclusion of this class only in its terms but also^ upon the familiar rule, incl/wsio vrnms est exclusio alterius. Any right preserved, therefore, by this form of protest must be limited to discharged soldiers, the class, however, which involves the larger part of the claim.
The effect of the use of this form of protest upon these vouchers under such circumstances is the important question for consideration and one, perhaps, not free from doubt. The findings have stated the facts separately as to' each one of the classes involved, because it was conceived that under this form of protest there might be a right of recovery as to discharged soldiers which did not extend to other classes.
But, after all, does either form of protest under the circumstances preserve any existing right to additional compensation ? The question can not be treated with the brevity which is desirable, and its importance must justify such extended discussion as may seem necessary to a comprehensive *55 presentment of the situation dealt with and our views with reference thereto.
A protest can not create a right. It may preserve an existing right, although, when opposed by inconsistent action or circumstances, it may not always do that. Its chief function is, under appropriate circumstances, to avoid the effect of apparent acquiescence in the action of another.
Let us assume that at the time now in question the plaintiff believed, contrary to the holding of the comptroller, that it was entitled to be paid full tariff rates for the transportation in question. By its protest it indicates knowledge of the fact that the “ accounting officers ” disclaimed any authority to pay more than for the transportation of troops of the United States — that is, more than land-grant rates. It uses the Avords “ accounting officers,” although it was dealing with the presentment of its claims to disbursing officers, and there is a difference. The accounting officers, as the accounting system was then constituted under the Dockery Act, were, so far as its business was concerned, the Auditor for the War Department and the Comptroller of the Treasury. A disbursing officer was an accountable officer who accounted to the accounting officers for funds advanced to him on accountable warrants for which the vouchers paid by him are his' acquittance when his accounts go to the auditor for settlement.
An essential difference in practice is found in the fact that a Government creditor could present his claim to an auditor for the full amount claimed to be due, in this case full tariff rates. Upon disallowance by the auditor of any part of an item of a claim — land grant in this instance— the claimant had a right of appeal to the comptroller, but by statute it could not accept the part of a claim allowed by the auditor and have an appeal as to the disallowed part. 28 Stat. 208. It must in case of appeal to the comptroller send in the warrant issued to it for the allowed part of the claim, so that the comptroller might pass upon the Avhole claim and adjust an over as well as an under payment. Then there was, of course, access to this court, in connection with which it is important to consider that previous action * *56 either by accounting or disbursing officers is not an essential to the jurisdiction of this court in this class of cases.
Quite materially different was the practice when claims were presented to a disbursing officer for payment, and, aside from the presumptions, it is quite out of the question to assume anything else than actual knowledge of disbursing officer’s practice and authority on the part of those dealing so frequently with them. The number of claims involved in this case is illustrative of the extensive resort to this method of settlement and necessarily resultant knowledge. A disbursing officer was not permitted to receive a claim, disallow a part, and pay the remainder, as was the auditor. Reasons are too apparent to need amplification. A disbursing officer could only pay a claim when he deemed himself authorized to pay the “ amount claimed.” This is in line with and explains the suggestion frequently made in this class of cases, and' in the instant case, that when claims were sometimes presented to disbursing officers for such transportation at full tariff rates, claimants were informed that they could not be paid as presented; and if it was desired to procure payment at the hands of the disbursing officer, the most expeditious way of realizing on a claim, it was necessary to restate the bill on a basis upon which the disbursing officer was authoried to pay, since, as stated, the disbursing officer could not disallow in part and pay in part • as might the auditor, and the necessary restatement of accounts, to. procure payment by this method, is the basis of contention that the claimant is thus under duress.
It is perhaps as well here as later to say that with this contention we can not agree, for in point of fact there is to be found in the transaction no element of duress at all, and this seems so apparent that it is hardly worth while to discuss at length what may constitute duress. The disbursing officer in such circumstances does, in effect, say to the claimant, “ You must state your claim on the basis upon which I can pay it and none other if you want payment at my hands,” but there is no compulsion so to proceed, for other doors are open wherein the claimant may state its *57 ulaim as it sees fit. And if it suggests, as has so often been done, the probable futility of proceeding- through the accounting officers, where it could at least be in the position of asserting its full claim no matter what the result, its contention is not aided, for in addition to the right to so assert the claim to the accounting officer there was always access to this court independent of precedent action. And so the stating to a disbursing officer of an account upon the basis required by him if he is to-pay it is nothing but a compliance with conditions necessary to procure a settlement by that method, which a claimant must regard as to its advantage, rather than other procedure, and can not be regarded otherwise than as purely voluntary on its. part.
This condition, however, is of weight in determining the status of a disbursing officer’s settlement, a matter of importance in the consideration of the effect, if any, to be given a protest indorsed thereon, a procedure which the disbursing officer should not have permitted, since its purpose is to convert a disbursing officer’s voucher into something else than that which, under authoritatively established practice, it was intended to be. And that was not a right possessed by a claimant, for it amounted, if it amounted to anything, to a modification of a voucher form prescribed by proper officers under authority of law and therefore as essentially a requisite of a proper account as if prescribed by the law itself. For this form of voucher, used in the instances under consideration, a form for use in claiming for transportation .subject to land-grant deduction, provided for the statement in appropriate columns of all the data necessary to the proper determination of the “ amount claimed ” which was required to be certified by the claimant as correct, contemplated a complete statement of the claim in full, not subject to alteration, and evidencing, when paid, a completed transaction, the voucher having no further function than to procure for the disbursing officer a proper credit for the amount shown thereby to have been claimed by the creditor and paid by the officer. Mistakes of fact occurring therein would no doubt be subject to correction, but with that matter we have nothing to do here.
*58 It is therefore clearly subversive of the intended character and effect of a settlement made as lawfully prescribed to conclude that such a settlement in all respects intended to be final, and which without the element of finality in the sense of payment in full, did not authorize the payment thereon of appropriated public funds by a disbursing officer, to conclude that a claimant by some process of protest indorsed by it thereon could thus convert such an instrument into a claim for partial payment with .reserved right as to further compensation for the same service.
The inconsistency of the procedure has heretofore been alluded to. Its attempt to accomplish by this method that which by usual processes could not be accomplished is strongly argumentative. We have seen that the claimant might not, in one of the instances under consideration, have presented to a disbursing officer a claim for full tariff rates, have procured the disbursing officer to disallow a part and to allow and pay a part, making of the transaction a partial settlement. The requirement in such a case that the claim be stated on the basis on which it can be paid in full has also been cited. Yet, the adopted method, if recognized as effective for the intended purpose, does in fact, and that purpose is expressed in the protest, convert the claim into a claim for partial payment and put the disbursing officer in the position of doing the very thing which it is recognized he could not do in regular course.
All claims were required to be submitted on approved forms, forms which had hack of them the authority of law and the right to prescribe their use for the intended purposes. There were voucher forms for the submission of claims for transportation where full commercial rates were claimed upon the face of which their nature and use was indicated by the words “No land grant involved.” They were intended to be and were used where the claimant was asserting a right to compensation at full commercial rates, and they were not used and could not be used to' procure a settlement by a disbursing officer in cases where he could or would pay only land-grant rates. If presented to a disbursing officer for payment under such circumstances, and the claimant was not willing to restate its claim on the basis *59 on which it could be paid by the disbursing officer, it became his duty to transmit the claim for direct settlement by the auditor without making any payment thereon at all, for he could not on such a voucher pay the amount due at land-grant rates and leave an unpaid balance over. He could not settle in part a disputed claim, but must send it where there was authority so to do. His settlement must be a clean-cut settlement of the whole claim as presented or nothing. If, with full knowledge of all these facts — and knowledge thereof has never been disputed by any railroad company with whose claim we have had to do — a railroad claimant presents its claim on a land-grant voucher at land-grant rates, certified by it to'be correct, for the purpose of procuring payment at the hands of a disbursing officer, is it possible that it can of its own motion, by an unauthorized indorsement on an official voucher, convert it into a claim for full commercial rates and make of it in effect just such a claim as the disbursing officer had no authority to settle? Such a right, if a claimant had it, would permit it to subvert the whole prescribed system of settlement and accounting and to make of an official voucher something else than that which by authority of law it is prescribed to be. And, if so, must be held effective for that purpose without presentment, in connection with a claim, to anyone having authority to consider disputed claims, for the vouchers upon which they appeared were defunct as claims when paid by the disbursing officer, could not go to the accounting officers for further allowance thereon as claims, and served only as vouchers to support the disbursing officer’s claims in his account current for credits in the amounts thus shown to have been paid by him out of the funds for which he was accountable.
And it may be added that no act of a disbursing officer outside of his authority could create any liability against the United States which did not otherwise exist or abrogate any existing right, and payment by him of a voucher bearing such a protest could under no circumstances be construed as a recognition on the part of the United States of a right to make further claim for the same service. He had no such *60 authority. Nor could the claimant create for itself any right by attempted departure from established methods. The law gave to the Comptroller of the Treasury power to prescribe forms and to regulate the methods of expending and accounting for public funds and conditions imposed by him within the proper exercise of his prerogatives were as if prescribed by the law itself and protest can not in any manner circumvent statutory conditions. In Dowdy v. United States, 23 C. Cls. 97, interpreting an act authorizing payment of certain claims allowed by the accounting officers but providing that such payments should be accepted as a full and final discharge of the claims, it was said, “ The fact that the money was received under protest, although no receipt was required except the necessary indorsement of the Treasury check, indicates that the claimant understood the statute as we understand it, and endeavored by a protest to avoid it,” a suggestion peculiarly applicable to our interpretation of a disbursing officers voucher, and later it is said, “ No effect can be given to the protest,” referring, of course, in that case to the terms of the act, but applicable, we think, to a condition here of equal force.
In Savage v. United States, 92 U. S. 382, we find many pertinent statements, some of- them very much in point on questions already discussed. Savage had purchased $15,000 of Treasury notes represented by a special agent of the Treasury Department as payable in gold but held by the Secretary of the Treasury, at time of payment, as not so payable but payable in currency. Gold was then worth a premium of 32 cents. It is said that there was an honest difference of opinion, Savage contending for payment in gold while the Secretary refused to make payment otherwise than in currency, and so informed him. Savage sent his Treasury notes to his banking representatives in Washington and they were presented at the Treasury Department and gold demanded in payment, which was refused. Savage then instructed his bankers to accept payment in currency and surrender the notes, but with instructions to first demand payment in gold, but if refused to accept payment otherwise than in gold under protest. The bankers presented the notes and asked for payment in gold, which was refused, and they there- *61 > after, by a communication in writing, in which they recited the presentment of the notes with a request for payment in gold and on refusal presented them for payment “ in accordance with the terms proposed by the Treasury Department,” but stating also that “ at the same time we beg, under our instructions, to enter protest against payment otherwise than in gold.”
The decision of the Supreme Court was on appeal from this court where the administratrix of Savage had sought to recover the difference between the value of the currency in which payment was made and gold, the right to receive which was asserted. In the Supreme Court questions presented in this court upon which the decision against the plaintiff was predicated -were disregarded and the ease turned upon the final transaction of the surrender by Savage of the Treasury notes and the receipt of payment therefor in currency even though accompanied by a protest. Much stress is laid upon Jhe actual surrender of the Treasury notes by Savage, referred to as a condition, precedent to his right to receive payment, but the stressing of the surrender of the notes was but the natural basis of the reasoning of the court, under the circumstances of that case, and does not seem to us to detract from the force of the principles stated as applicable to the transaction. In fact the surrender of the notes would not seem to differ so materially from the presentment of a proper disbursing officer’s voucher as to change the conclusion to be reached as to the effect of an accompanying protest in either case. The Treasury notes held by Savage and presented for payment were the evidence that he was a creditor of the United States in return for which he received $15,000 of principal in currency because the Secretary refused payment in gold worth $19,800 to which he asserted he was entitled, and endeavored by protest to preserve an asserted right to an additional payment of $4,800 representing the difference in value between what he asserted he was entitled to receive and what the Secretary was willing to and did pay. The difference was a difference in medium but it necessarily resolved itself into a difference in dollars measured by legal tender currency and upon such a demand was the suit predicated. The plaintiff’s vouchers in this case *62 represented its claims as a creditor of the United States because of services rendered and if stated and presented for payment at land-grant rates, even though it deemed itself entitled to other and higher rates, because it had been informed that the disbursing officer had refused and would refuse to pay more, it would seem to be in the same position as Savage when he presented his notes for payment in currency and received payment in currency, a lesser value than he claimed, because he had been informed that the Secretary would not pay otherwise. And it would seem that a properly stated voucher, certified and paid, was as full an acquittance of the United States as to the claim stated therein as was the surrender of the Treasury notes, for it must be conceded, because so decided, that all vouchers involved in this case, so stated, certified and paid, if without protest, would preclude further recovery for the same service. Can a protest, then, avail in the one case when it was held to be ineffective in the other % r
The opinion is replete with apt statements, addressed, of course, in many instances, to the fact that the Treasury notes were voluntarily surrendered, but stating conclusions as clearly applicable here, since, as we have already pointed out, the plaintiff’s statements of its accounts at land-grant rates and acceptance of payment on that basis was clearly voluntary. Since it is a matter of common knowledge that disbursing officer’s settlements secure more prompt payment than otherwise and that this is the reason for resorting thereto.in cases like this the following language is pertinent:
“Prompt payment, no doubt, was desired; but the decedent was under no legal compulsion to accept any other medium of payment than that which he demanded. Both he and his agents were doubtless convinced that the Secretary would not recede from the position he had taken; but he was at perfect liberty to reject the terms proposed and to refuse to surrender the overdue securities which he held.”
Anri summarizing the case with a reference to the effect of the protest, it is said:
“ Taken as a whole, the findings of the court below show beyond all doubt that the decedent, voluntarily and with a full knowledge of all the circumstances, elected to accept *63 payment of the Treasury notes in the manner proposed by the Secretary, and that the surrender of the same to the United States was absolute and unconditional. Nothing less can be inferred from the communication of his agents inclosing the securities when the same were transmitted for redemption, in which his agents say that they ‘ present the notes for payment in accordance-with the terms proposed5' by the department. Such an acceptance, if intended to waive every variation from the terms antecedently demanded, could hardly be more complete or explicit; nor is its real character changed in any respect by the fact that, the agents asked leave in the same communication ‘ to enter protest, under their instructions, against payment otherwise than in gold.5 55
Reverting to our discussion of the form, purpose, and authoritative character of these disbursing officers’ vouchers as stated, presented, and paid in this case, we can not but conclude that their real character was not changed in any respect by the attached protest.
Very forcible and peculiarly pertinent is the language of Justice, afterward Chief Justice,. White, speaking for the Supreme Court in International Contracting Co. v. Lamont, 155 U. S. 303 at 310, where, referring in general terms to the efficacy of a protest, it is said: “A party can not. avoid the legal consequences of his acts by protesting at the time he does them that he does not intend to subject himself to such consequences.55 The legal consequences of' the presentment of these claims to the disbursing officer as-they were presented without protests thereon and receipt of payment of the amount claimed have been determined by this court with the approval of the Supreme Court in cases' cited. They precluded further recovery. From such consequences resulting from its own acts the plaintiff may not relieve itself by protesting that it didn’t mean it.
There is another condition bearing upon plaintiff’s claims herein, and particularly, it seems to us, upon the question of protest which, while sometimes suggested in other cases,, has never received any lengthy consideration. It is observed that under some decisions of the Comptroller of the-Treasury involving payment to land-grant railroads for the character of transportation here involved it has not been, *64 specifically held that classes of persons under consideration were essentially “ troops ” of the United States, but the holding has been that the transportation companies were not entitled to be paid therefor more than land-grant rates.
This holding has been predicated upon provisions found in the Army appropriation acts under the subhead “ Transportation of the Army and its supplies,” which provisions were repeated in all of such appropriation acts during the period here involved and for a number of years theretofore. The appropriation act for the fiscal year 1914, beginning July 1, 1913, 37 Stat. 715, appropriated under the subhead stated, “For the transportation of the Army and its supplies; * * * for transportation of recruits and recruiting parties; of applicants for enlistment between recruiting stations and recruiting depots; for travel allowance to enlisted men on discharge; of persons on their discharge from the United States military prison or from any place in which they have been held under a sentence of dishonorable discharge and confinement for more than sis months, * * * ‘ for the payment of Army transportation lawfully due such land-grant railroads as have not received aid in Government bonds (to be adjusted in accordance with the decisions of the Supreme Court in cases decided under such land grant acts), but in no case shall more than fifty per centum of full .amount of service be paid: Provided, That such compensation shall be computed upon the basis of the tariff or lower special rates for like transportation performed for the public at large and shall be accepted as in full for all demands for such service: ’ ” followed by a further proviso limiting-payments to land-grant roads in the expenditure of the money appropriated by the act and providing again that the amount so fixed to be paid shall be accepted as in full for all demands for such service.”
The tendency of Congress seems to have been to gradually provide for the payment of the classes of transportation under consideration here out of this appropriation and subject it to the limitations thereof. Some time before the period in question the transportation of applicants for enlistment had been payable out of another appropriation, *65 and previous to tlie fiscal year of 1914 travel allowance of discharged soldiers was provided for by a separate item found in miscellaneous provisions in the Army appropriation acts, and for the first time was brought. within the provisions for the transportation of the Army and its supplies on the passage of the act referred to for the fiscal year 1914.
It is the matter of transportation of discharged soldiers with which we are particularly concerned. - In view of what has already been said with reference to the situation during the third period here involved and in that connection it is not inappropriate to suggest that while the appropriation in terms “ for travel allowance to enlisted men on discharge ” implies a payment to be made to the enlisted men, the law had authorized and it was the practice to furnish to the enlisted man, in lieu of a part of his travel allowance, transportation in kind which is evidenced by a transportation request issued to him and finally made the basis of a claim by the transportation company for the transportation furnished upon that request.
The particular matter for consideration is, of course, the effect of the. limitation put upon the expenditure of the funds appropriated for this particular purpose by this act. It is limited to fifty per cent of commercial rates, or, in other words, limited to payment at land-grant rates, with the specific provision that payment so made must be accepted as in full for the transportation furnished. With the provisions of this act the transportation companies are, of course, chargeable with knowledge, a knowledge which they, no doubt, possessed in fact, and it would seem that it must necessarily follow that when a transportation company presented to a disbursing officer a claim for transportation which it knew, or at least was presumed to know, was payable out of this particular appropriation and could not be paid out of any other it must subject itself to the limitations of the act and be chargeable with the acceptance of the amount paid as in full. In Dowdy v. United States, supra, involving a payment under a statute providing that the amount paid should be accepted as a full and final dis *66 charge of the several claims examined and allowed by the accounting officers, in which case it was sought to preserve a further right by a protest, it was said
“ No effect can be given to the protest. The act prescribed the only terms upon which payment could be tendered or received. It is very clear to the court that a party accepting money under positive statutory conditions can not vary the conditions by merely protesting against them. Acceptance of the money is necessarily an agreement to the terms. Cape Ann, Granite Co. v. United States, 20 C. Cls. 1; Savage v. United States, 92 U. S. 382.”
If it be said that the provisions of this act may not be here invoked against the plaintiff because it has been held that the classes of persons here involved are not “ troops ” of the United States, it is sufficient to say that for transportation purposes, at least, Congress saw fit to so treat them, and by making their transportation payable out of this par-tícula); appropriation it necessarily made these payments subject to the conditions attached to the expenditure of the moneys appropriated for that purpose. It is not necessary to hold that the limitations of that act could affect or alter the right of this court to adjudge whatever compensation it might deem railroad companies entitled to for this class of transportation. The effect of the act manifests itself not upon the jurisdiction of this court, but upon the transaction as between the claimant and the disbursing officer at the time of the presentment and payment of a claim payable out of the moneys appropriated by this act and subjects the claimants to the limitations prescribed, necessarily precluding any further recovery by reason thereof.
The question herein presented and discussed was not involved in the Union Pacific case, wherein the status of these various classes of persons was considered and determined. It is noticeable that in that case, which was prepared for the purpose of testing the status of these classes of persons as “ troops ” of the United States and which was prepared during the period covered by the transactions here involved and by the same attorney representing that plaintiff and *67 tliis, and which was based upon transportation furnished during 1913,1914, and 1915, reliance was not on “ protested ” disbursing officer’s vouchers, but upon claims for full commercial rates presented to the auditor for direct settlement, upon settlement of which that official disallowed and deducted land grant, a procedure entirely within his proper powers, against which deduction the plaintiff protested and appealed to the Comptroller of the Treasury and thereafter brought its suit for the amounts disallowed by the auditor, viz, the difference between the amount claimed and the amount allowed. The distinction is manifest.
The views expressed require the conclusion that the plaintiff is not entitled to recover as to either of the periods considered. A dismissal of its petition has therefore been directed.
Eeference is made to the opinion by the Chief Justice discussing practically the same question in case No. 30-A, Western Pacific Railroad Company, this day decided.
Geaiiam, Judge; Hay, Judge; Booth, Judge, and Camp- . bell, Chief Justice, concur.